FILED
2011 May-26  PM 01:29
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

JUANITA SAINT HENRY,      )
           )
     **Plaintiff,**      )
           )
v.            )      **Civil Action No. CV-10-S-2387-NW**
           )
STONEBRIDGE LIFE      )
INSURANCE CO.,      )
           )
     **Defendant.**      )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Juanita Saint Henry, originally filed this case on March 19, 2010, in the Circuit Court of Colbert County, Alabama, asserting claims for breach of contract and bad faith, both of which are based upon defendant's alleged failure to pay benefits due under an accidental death or dismemberment insurance policy for which she is the beneficiary. Plaintiff subsequently amended her state court complaint on August 4, 2010, to increase the amount requested under the policy, and defendant removed the case to this court on September 2, 2010, asserting federal subject matter jurisdiction based on satisfaction of the requirements of the diversity statute, 28 U.S.C. § 1332.[1] The case currently is before the court on defendant's motion for

---

[1] *See* doc. no. 1 (Notice of Removal) and attachments. The amended state court complaint increased the amount demanded by plaintiff under the insurance policy in question from $30,000 to $55,000. In its removal, defendant asserted that the $55,000 amount, coupled with the requested punitive damages, would raise the amount in controversy above the $75,000 jurisdictional threshold. *See* 28 U.S.C. § 1332. Plaintiff has not contested that

summary judgment.[2]  Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes the motion is due to be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is

---

assertion.

[2]Doc. no. 3.

[3] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

The facts of this case are not in dispute.[4]  Defendant, Stonebridge Life

Insurance Company, issued Policy Number 25411, an accidental death and

dismemberment policy covering Mr. Bonnie Lee Henry, on October 17, 1994.[5]  The

policy provides coverage for death or dismemberment suffered as a result of an

---

[4]*See* doc. no. 15 (plaintiff's brief), at 1 ("Plaintiff does not dispute any of the
Movant's ten statements."); doc. no. 17 (defendant's reply brief), at 1-2 (admitting the
substance of all of plaintiff's factual allegations, but providing some clarifications).

[5]Defendant's evidentiary submission, Exhibit 1 (Affidavit of Rhonda Caldwell), at
¶ 2; *see also* Caldwell Affidavit, Exhibit A, at document bearing Bates Stamp No.
Stonebridge 002.

"injury," which is defined as "bodily injury caused by an accident occurring while the insurance is in force resulting . . . directly and independently of all other causes . . . ."[6]  The policy also contains the following exclusion:  "No benefit shall be paid for Loss or injury that . . . is due to disease; bodily or mental infirmity; or medical or surgical treatment of these."[7]

Bonnie Lee Henry died on April 10, 2008, and his wife, plaintiff Juanita Saint Henry, submitted a claim for accidental death benefits under the policy.[8]  Mr. Henry's death certificate stated that the immediate cause of death was "acute cardiopulmonary arrest, due to (or as a consequence of): sepsis due to accidental colon perforation via colonoscopy, due to (or as a consequence of): multi-organ failure, due to (or as a consequence of): colon cancer."[9]  Mr. Henry's primary care physician, Dr. Timothy Ashley, referred him for the colonoscopy because he had complained of blood in his stool.[10]

Stonebridge denied Mrs. Henry's claim by letter dated September 16, 2008.

---

[6]Exhibit A to Caldwell Affidavit, at document bearing Bates Stamp No. Stonebridge 004.

[7]*Id.* at document bearing Bates Stamp No. Stonebridge 006.

[8]Caldwell Affidavit, at ¶¶ 3-4.

[9]Exhibit A to Caldwell Affidavit, at document bearing Bates Stamp No. Stonebridge 159.  There are actually two versions of the Death Certificate on the record.  It is unclear which is dated first, but there are no material differences between the two.  *Compare id.* at document bearing Bates Stamp no. 159 *with id.* at documents bearing Bates Stamp Nos. 0069-0070.

[10]*Id.* at document bearing Bates Stamp No. Stonebridge 0065.

The letter cited the exclusion for injury or loss as a result of "disease; bodily or mental infirmity; or medical or surgical treatment of these," and went on to state:

> Based on the medical information in our file, which includes the Death Certificate and medical records obtained from Dr. Timothy Ashley, Brookwood Medical Center and Eliza Coffee Memorial Hospital, it appears your husband's death was due to medical and surgical treatment of disease.
>
> The medical records obtained from Dr. Timothy Ashley show your husband was prescribed to have a colonoscopy after he was seen on February 13, 2008 with a diagnosis of rectal cancer, found 1997, complaining of a bloody stool. Your husband underwent a colonoscopy at the Brookwood Medical Center where his colon was perforated during the colonoscopy. He later was admitted to the Eliza Coffee Memorial Hospital with abdominal distention status post colonoscopy where he unfortunately passed away.
>
> The Death Certificate shows the immediate cause of your husband's death was acute cardiopulmonary arrest, due to or as a consequence of sepsis due to accidental colon perforation via colonoscopy, due to or as a consequence of multi-organ failure, due to or as a consequence of colon cancer. It is noted that all injury-related questions on the Death Certificate were left blank.
>
> Since it appears your husband's death was due to the medical and surgical treatment of disease and not due to bodily injury caused by an accident resulting directly and independently of all other causes, in any loss covered by the policy, as required by the certificate, no benefit is due. It appears your husband's death does not come within the coverage terms and conditions of this certificate and this loss would be excluded from coverage as stated in the certificate exclusion mentioned on page one of this letter.[11]

---

[11]*Id.* at documents bearing Bates Stamp Nos. Stonebridge 0084-0085.

On October 30, 2008, Dr. Douglas Dickinson, the physician who performed the

colonoscopy, sent a letter to the Claims Department at Stonebridge, stating:

> I am responding to questions concerning the death of Mr. Bonnie L. Henry.  This patient's death was directly related to a complication from colonoscopy.  This patient had previous rectal cancer and had previous colostomy with abdominal perineal resection and at colonoscopy on 3/25/2008 had a recurrent adenomatous colon polyp removed.  Post polypectomy, this patient had abdominal pain which initially did not show evidence of perforation on abdominal x-ray and abdominal CAT scan but subsequently the patient was hospitalized with delayed perforation which was the primary cause of his ultimate death.  The complications of sepsis and acute respiratory distress were all secondary to this perforation.  In the broad scheme of things, this colonoscopic complication should be considered the cause of his accidental death.  He was cured of his colon cancer in 1997.
>
> Please review this patient's bodily injury caused by colonoscopy as an accidental death which should be covered by his insurance policy.  The death certificate seems to be missing the primary cause of this gentlemen's [sic] death.[12]

In response, Stonebridge sent Dr. Dickinson a letter on November 10, 2008,

stating in pertinent part:

> The attached medical records obtained from Dr. Tim Ashley regarding Mr. Henry's office visit of February 13, 2008 show: "Patient complains of bloody stool.  The first time the hematochezia occurred was 3 months ago.  With this acute episode, he has been seeing visible blood approximately 1-2 times per week times [sic].  The frequency of the hematochezia is several times weekly.  He estimates the total amount of blood loss is less than a few drops.  Off Plavix for past 2 months.  Blood is noticed around colostomy stoms and coming from the middle

---

[12]*Id.* at document bearing Bates Stamp No. Stonebridge 0054.

6

of the stoma.  PLAN: Bloody stool go ahead and have colonoscopy by Dr. Dickerson [sic] (gastroenterologist)."

Dr. Dickinson, are we correct in our understanding that the colonoscopy performed by you on March 25, 2008 was for the diagnosis and treatment of Mr. Henry's bloody stool?[13]

Dr. Dickinson checked "yes" in response to Stonebridge's question, and also stated,

"Additionally had abd[ominal] pain and past rectal cancer."[14]

On December 19, 2008, Stonebridge sent Mrs. Henry another letter, stating:

Thank you for allowing us to again evaluate this claim along with Dr. Douglas S. Dickinson's letter dated October 30, 2008 and the amended Death Certificate dated August 12, 2008.

Dr. Dickinson mentions in his letter that your husband's death was directly related to a complication from colonoscopy.  We contacted Dr. Dickinson and were told the colonoscopy performed by him on March 25, 2008 was for the diagnosis and treatment of your husband's bloody stool.  The amended Death Certificate you provided shows the immediate cause of your husband's death was acute cardiopulmonary arrest, due to or as a consequence of sepsis due to accidental colon perforation via colonoscopy, due to or as a consequence of multi-organ failure, due to or as a consequence of colon cancer.

Based on the above information and the information mentioned in our letter to you dated September 16, 2008, it appears your husband's death was due to the medical and surgical treatment of disease or bodily infirmity and not due to bodily injury caused by an accident resulting directly and independently of all other causes, in any loss covered by the policy, as required by the certificate.  It appears your husband's death does not come within the coverage terms and conditions of this

---

[13]*Id.* at document bearing Bates Stamp No. Stonebridge 0050.

[14]*Id.*

7

certificate and this loss would be excluded from coverage as stated in the certificate exclusion mentioned in our letter dated September 16, 2008.[15]

Dr. Dickinson again wrote to the Claims Department at Stonebridge on February 3, 2009, stating:

I am responding to your letter of December 19, 2008 to Mrs. Juanita Henry, spouse of Mr. Bonnie Henry. In your note to Mrs. Henry, I find that you correctly note that Mr. Bonnie Henry's death was directly related to a complication from colonoscopy performed by me on March 25, 2008. However, you note that the colonoscopy was done for treatment of Mr. Henry's bloody stool. That latter statement is not correct and I think if you will note on my letter of November 10, 2008, I put down additionally the patient had abdominal pain and previous rectal cancer. The key word here is actually "previous rectal cancer." Patients with previous colorectal cancer are at high risk for recurrent polyps and need to be screened long term to prevent recurrent colon polyps, which are precursors to colon cancer. Although this patient had some complaints of bloody stool noted by Dr. Tim Ashley (notes from 02/13/2008), the primary reason for doing colonoscopy on this gentleman was for screening purposes because of his high risk associated with his previous colorectal cancer. If we find recurrent polyps in these patients and can remove them prophylactically, the literature shows that we can prevent colon cancer. My dictated colonoscopy report on Mr. Henry from 03/25/2008 had a misstatement under indications wherein it says "who returns to rule out Crohn's disease" that should be read as "to rule out metachronous disease." That term metachronous means recurrent colon neoplasia. That is the primary reason why this test was done.

In conclusion, this gentleman's demise was caused by a complication from colonoscopy and not caused by his blood in the stool. Therefore the cause of death was the result of an accident (complication

---

[15]*Id.* at document bearing Bates Stamp No. Stonebridge 0046.

8

of the colonoscopy procedure).  The blood in the stool probably came from some stomatitis around his stoma, as the colon polyp itself was not bleeding.

Please note that on my colonoscopy report under discussions, we noted that [we] "would recommend rechecking this gentleman's colon again in three years based on his high risk status."  That is further evidence as to why this gentleman had colonoscopy on this date.  His previous colonoscopy was in 07/2004 and he was actually a little overdue for repeat surveillance colonoscopy because of his high risk status.

Thanks again for your attention to this note and I hope that you can correctly conclude that the accidental perforation of this patient's colon was the cause of the secondary complications of sepsis, acute respiratory distress, and unfortunate death in Mr. Bonnie L. Henry.[16]

Stonebridge responded with its final decision in a letter addressed to Mrs.

Henry on February 23, 2009, stating, in pertinent part, as follows:

Thank you for allowing us to again evaluate this claim along with Dr. Douglas S. Dickinson's letter dated February 3, 2009.

The medical information in our file shows your husband's colon was perforated during a colonoscopy which was being done due to blood in his stool, abdominal pain and previous rectal cancer.  The Supplemental Medical Certification shows the immediate cause of death was acute cardiopulmonary arrest, due to or as a consequence of sepsis due to accidental colon perforation via colonoscopy, due to or as a consequence of multi-organ failure, due to or as a consequence of colon cancer.

Based on the medical information and letter from Dr. Dickinson, your husband's death was due to the medical and surgical treatment of

---

[16]*Id*. at documents bearing Bates Stamp Nos. Stonebridge 0042-0043.

disease or bodily infirmity and not due to bodily injury caused by an accident resulting directly and independently of all other causes, in any loss covered by the policy, as required by the certificate and this loss would be excluded from coverage as stated in the certificate exclusion mentioned in our letter dated September 16, 2008.[17]

## III. DISCUSSION

Plaintiff asserts claims for breach of contract and bad faith under Alabama law.

In order to establish a breach-of-contract claim, a plaintiff must show "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Southern Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citations omitted). The elements of a cause of action for a bad-faith refusal to pay an insurance claim were set out in *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179 (Ala.1982):

> "[T]he plaintiff in a 'bad faith refusal' case has the burden of proving:

> "(a) an insurance contract between the parties and a breach thereof by the defendant;

> "(b) an intentional refusal to pay the insured's claim;

> "(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

> "(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;

> "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's

---

[17]*Id.* at document bearing Bates Stamp No. Stonebridge 0040.

intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

> "In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim."

*Id.* at 183 (first emphasis added). *See also Chavers v. National Sec. Fire & Cas. Co.*, 405 So.2d 1 (Ala. 1981). *Thus, a breach of the insurance contract is an element of a bad-faith-refusal-to-pay claim.*

*Ex parte Alfa Mutual Insurance Co.,* 799 So. 2d 957, 962 (Ala. 2001) (emphasis supplied).  Based on these principles, at the core of both of plaintiff's claims in this case is whether defendant properly excluded plaintiff's claim for death benefits on the basis that Mr. Henry's death was the result of "disease; bodily or mental infirmity; or medical or surgical treatment of these."

"In general, the insurer bears the burden of proving the applicability of any policy exclusion." *Acceptance Insurance Co. v. Brown,* 832 So. 2d 1, 12 (Ala. 2001) (citing *Fleming v. Alabama Farm Bureau Mutual Casualty Insurance Co.*, 310 So. 2d 200, 202 (Ala. 1975)).

> "Exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and must be construed most strongly against the company that drew the policy and issued it." *Alliance Ins. Co. v. Reynolds*, 494 So.2d 609, 612 (Ala. 1986). Where there is no ambiguity in the terms of an insurance contract, the language must be enforced as written, and courts cannot

11

defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties; however, "'when ambiguity exists in the language of an exclusion, the exclusion will be construed so as to limit the exclusion to the narrowest application reasonable under the wording.'" *Carpet Installation & Supplies of Glenco v. Alfa Mut. Ins. Co.*, 628 So. 2d 560, 562 (Ala. 1993)(quoting *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.*, [595 So. 2d 1375, 1377 (Ala. 1992))].

*Porterfield v. Audubon Indemnity Co.,* 856 So. 2d 789, 806 (Ala. 2002).

The Alabama Supreme Court

has discussed the identification and resolution of ambiguities in insurance policies as follows:

"'The test to be applied by [a] court in determining whether there is ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean.' Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:14, pp. 21-23 (3d ed. 1997); *see, also, Western World Ins. Co. v. City of Tuscumbia*, 612 So.2d 1159, 1161 (Ala. 1992) (same); *St. Paul Fire & Marine Ins. Co. v. Edge Memorial Hosp.*, 584 So. 2d 1316, 1322 (Ala. 1991) (stating that language in an insurance policy should be given the same meaning that an ordinary person, not a lawyer, would reasonably ascribe to the language). The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning. *See United Services Auto. Ass'n v. Smith,* 57 Ala. App. 506, 329 So. 2d 562 (Ala. Civ. App. 1976). In determining whether an ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous. *See Alabama Farm Bureau Mut. Cas. Ins. Co. v. Goodman,* 279 Ala. 538, 541, 188 So. 2d 268, 270 (1966). This means that the terms of an insurance policy should be given a rational and practical construction. *Green v.*

12

> *Merrill*, 293 Ala. 628, 308 So. 2d 702 (1975).  Also, a court
> cannot consider the language in the policy in isolation, but must
> consider the policy as a whole. *Turner v. United States Fidelity &
> Guar. Co.*, 440 So. 2d 1026 (Ala. 1983)."

> *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308-09 (Ala.
> 1999).  "Further, [the Alabama Supreme] Court has ruled that exceptions
> to coverage must be interpreted as narrowly as possible to provide the
> maximum coverage available." *Sullivan v. State Farm Mut. Auto. Ins.*,
> 513 So. 2d 992, 994 (Ala. 1987).

*Porterfield,* 856 So. 2d at 800.

> The term "disease" is defined in a common, authoritative dictionary as

> an impairment of the normal state of the living animal or plant body or
> of any of its components that interrupts or modifies the performance of
> the vital functions, being a response to environmental factors (as
> malnutrition, industrial hazards, or climate), to specific infective agents
> (as worms, bacteria, or viruses), to inherent defects of the organism (as
> various genetic anomalies), to combinations of these factors:
> SICKNESS, ILLNESS.

*Webster's Third New International Dictionary* 648 (2002).[18]   An "infirmity" is

defined as "the quality or state of being infirm," or "an unsound, unhealthy, or

debilitated state." *Id.* at 1159.  "Infirm" is defined as "not strong or sound physically:

---

[18]Defendant cites the following definition from *Black's Law Dictionary*: "1.  A
deviation from the healthy and normal functioning of the body . . . . 2. (*pl*) Special classes
of pathological conditions with similar traits, such as having similar causes and affecting
similar organs . . . . 3.  Any disorder; any depraved condition." *Black's Law Dictionary* 524
(9th ed. 2009). The court concludes that a definition from a dictionary of common usage is
more appropriate than a definition from a legal dictionary, considering that the terms of an
insurance policy are to be construed according to the common usage of a reasonably prudent
person.  Even so, the court's definition is similar to the one proposed by defendant, and the
slight differences that do exist should not cause any material variations in the construction
of the term.

of poor or deteriorated vitality esp. as a result of age. . . ." *Id.* "Treatment" is defined, in relevant part, as "the action or manner of treating a patient medically or surgically." *Id.* at 2435. To "treat" is defined, in relevant part, as "to care for (as a patient or part of the body) medically or surgically: deal with by medical or surgical means: give a medical treatment to . . . ."

The court finds no ambiguity in any of these terms, and, consequently, no reason to construe them in favor of either party or assign them anything other than their ordinary meanings. Indeed, while plaintiff repeatedly states that the terms of the exclusion are ambiguous, what she is really arguing is that her claim does not fall under the exclusion. More specifically, plaintiff argues that the exclusion does not apply because the colonoscopy was just a routine screening procedure, and was not performed for the purpose of treating any particular disease or defect. Defendant, on the other hand, argues that plaintiff's claim is excluded because the colonoscopy was performed as part of a course of treatment for Mr. Henry's bloody stool.

Plaintiff correctly points out that defendant did not cite any binding Alabama law directly supporting its argument. That appears, based on the court's research, to be because the Alabama courts have not directly ruled on the issue. Defendant did, however, cite persuasive authority from this and other jurisdictions to support its position. Plaintiff, on the other hand, cited *no* relevant authority, focusing instead on

14

case law providing general propositions about contract interpretation and case law governing interpretation of pre-existing condition exclusions in insurance policies. The court finds those cases, especially the pre-existing condition cases, to be unhelpful, considering that the cases cited by defendant deal specifically with policy exclusions similar or identical to the one at issue here.

For example, in *Brooks v. J.C. Penney Life Insurance Co.,* 231 F. Supp. 2d 1136 (N.D. Ala. 2002), Mr. Brooks' physician performed an x-ray after Brooks had complained of increasing abdominal distention and swelling in his lower extremities. When the x-ray revealed a pleural effusion, the doctor ordered a CT scan of Brooks' chest to rule out an intrathoracic process, in light of Brooks' history of smoking and a past questionable lung mass. Brooks experienced a fatal reaction to the contrast dye used during the CT scan. His death certificate listed the cause of death as "'Anaphylactic Reaction to IV contrast,' due to or as a consequence of right pleural effusion and possible lung cancer." *Id.* at 1139. Brooks' wife filed for but was denied benefits under an accidental death and dismemberment policy with exclusionary language *identical* to that at issue here. *See id.* at 1138 ("In pertinent part, the Certificate states that '[n]o benefit shall be paid for Loss or Injury that . . . 7. is due to disease; bodily or mental infirmity; or medical or surgical treatment of these.'") (bracketed alteration and ellipses in original). Magistrate Judge John Ott of

15

this court concluded that Illinois law — which governed due to a choice of law clause in the insurance contract — "recognize[s] that medical treatment exclusions also refer to diagnostic procedures." *Id.* at 1140, 1143. Consequently, he held that "the CT scan at issue here falls within the exclusionary clause for a 'medical or surgical treatment' of a 'disease' or a 'bodily or mental infirmity,' and the damages caused by the CT scan would fall within the exclusion." *Id.* at 1143-44.

In so holding, Judge Ott relied heavily on the decision of the Illinois Appellate Court in *Litman v. Monumental Life Insurance Co.,* 682 N.E. 2d 135 (Ill. App. Ct. 1997). In that case, the court considered an accidental death policy with an exclusion for "[s]ickness or its medical or surgical treatment, including diagnosis." *Id.* at 136. The defendant insurance company denied benefits under that policy exclusion after the following events occurred:

> In June of 1993, Lyndie [the plaintiff's late wife] had surgery for ulcerated colitis; an illeanal anastomosis or "J pouch" was created to avoid the need for an ostomy bag. On Thanksgiving Day, 1994, Lyndie began to experience pain and was taken to the hospital where emergency surgery was performed to remove scar tissue from the previous surgery which had created a bowel obstruction. The scar tissue was removed. Exploratory surgery two days later indicated that a 10 to 12 inch segment of intestine did not have to be removed. Lyndie recovered from her surgeries and returned home five days later.
>
> During the second week of December, 1994, Lyndie's stitches were removed. A few days later, Lyndie began experiencing abdominal pain and was admitted to the hospital. On Wednesday, December 14,

16

1994, a feeding tube known as a Hickman line was inserted and was x-rayed to insure that it had been positioned properly.  On Thursday, the Hickman line was utilized to provide nourishment to Lyndie for her surgery on the following Tuesday.

On the morning of December 20, 1994, Lyndie's third surgery was successful and the blocked segment was removed. Lyndie returned from the recovery room around 3:00 p.m. and was doing fine when plaintiff left at 10:00 p.m.  At 7:15 a.m. the next morning, however, plaintiff was notified by the hospital that Lyndie was having a major heart attack.  The Hickman line had shifted and pierced through the superior vena cava and perforated the lateral wall of the right atrium, causing cardiac arrest.  Fluid from the Hickman line had filled Lyndie's pericardial sac, causing death at 8:00 a.m.

*Id.* at 136-37.  The plaintiff insisted that the medical exclusion did not apply because

"the Hickman line here was not inserted as a treatment for ulcerated colitis or the

obstructed bowel," and the perforation did not occur at the moment of insertion  *Id.*

at 138.  The court disagreed, finding instead that,

[a]lthough the Hickman line did not perforate Lyndie's heart at the moment of insertion by a physician, it was introduced in order to prepare Lyndie for surgery and was used continuously to nourish her. Lyndie's medical treatment did not terminate once the medical procedure of installing the Hickman line was completed; rather, the use of the Hickman line was an ongoing process that constituted an important part of her medical treatment. . . .  Since Monumental's policy expressly precludes coverage for losses caused by medical treatment, the exclusionary clause applies to bar coverage here.

*Id.*  The court further noted that

the Hickman line was . . . essential to Lyndie's well-being and recovery: it enabled Lyndie to undergo her third surgery in as many weeks.  It is

17

> difficult to view the insertion of the Hickman line here as something
> other than medical treatment, that is, something "performed by a doctor
> or surgeon on the body of the patient *in the diagnosis of or in
> preparation for cure*."

*Id.* at 139 (citations omitted) (emphasis supplied).

Courts in other jurisdictions have reached similar results.  In *Krane v. Aetna Life Insurance Co.,* 698 F. Supp. 220 (D. Colo. 1988), the plaintiff's decedent passed away as a result of cardiac arrest of unknown cause while under general anesthesia for exploratory surgery of his parathyroid gland.  *Id.* at 221.  The district court held that the plaintiff was not entitled to benefits under an accidental death and dismemberment policy, due to policy exclusions for "bodily or mental infirmity," "disease of any kind, and "medical or surgical treatment."  *Id.*  The court reasoned that "Mr. Krane's death was attributable to surgical treatment," and did not even consider that the exclusion might not apply since the surgery was exploratory in nature.  *Id.* at 223.

Also, in *Pickard v. Transamerica Occidental Life Insurance Co.,* 663 F. Supp. 126 (E.D. Mich. 1987), the plaintiff's decedent underwent a colonoscopy as part of a course of treatment for ulcerative colitis.  Medical staff gave him the wrong solution to drink in preparation for the procedure, and he died as a result.  *Id.* at 126.  The district court held that the defendant insurance company was correct in denying the

plaintiff's claim for benefits under a life insurance policy that excluded claims for death as a result of "bodily or mental infirmity, disease of any kind, or as a result of medical or surgical treatment therefor . . . ." *Id.* (ellipses in original). The court reasoned that the solution "was given [the decedent] in preparation for *a diagnostic procedure* undertaken as part of his treatment and that he was told to drink it by a medical person. If this case is not covered by the exclusion, the exclusionary provision would tend to become meaningless." *Id.* at 127 (emphasis supplied).

Although none of these cases are based on Alabama law, this court finds the reasoning of the cases to be sound and persuasive, and concludes that the Alabama courts would interpret the exclusionary clause at issue here no differently. Furthermore, interpreting exclusions for injuries incurred during medical treatment to include diagnostic procedures is in accordance with a growing trend among courts, as noted by a leading treatise on insurance law.

> While the word "treatment" in its strictest medical sense probably excludes some preliminary steps, especially procedures which a medical professional would categorize as "diagnostic," the courts have not generally recognized such a distinction. Instead, the typical judicial approach has been to view "treatment" broadly, as any activity or procedure which is a logical component of the entire process by which a medical professional would respond to a patient's complaints.
>
> The words "medical and surgical treatment," as used in an accident insurance policy excluding loss caused by medical or surgical treatment, mean that which is done by a physician of any recognized

19

type or by a surgeon in diagnosing a bodily ailment and seeking to alleviate or cure it, and not only relate to the activity of the physician or surgeon, but also include those things done by the insured patient to carry out specific directions given by his or her physician for the purpose of effecting a cure or alleviation of his or her condition or illness.

L. Russ, *10 Couch on Insurance* § 141:91 (3d ed. 2010). The same treatise also states:

Death or injuries attributable to diagnostic or exploratory procedures have been consistently found to fall within exclusions for medical treatment, on the general theory that the term treatment necessarily encompasses such procedures, which is an indispensable part of the overall process by which the medical practitioners seek to alleviate patients' symptoms and disorders.

*Id.* at § 141:93 (footnote omitted).

In accordance with all of the above authority, this court concludes that defendant properly denied Ms. Henry's claim for benefits because Mr. Henry's death resulted from complications of a colonoscopy performed as a diagnostic tool recommended by his primary physician as part of a course of treatment for complaints of bloody stool. Plaintiff's argument that the colonoscopy was performed solely as a screening procedure, not as a course of treatment for any disease or infirmity, is not supported by the record. Plaintiff has offered no evidence to refute Dr. Ashley's medical records, which clearly indicate that the doctor referred Mr. Henry for the colonoscopy because he had complained of blood in his stool. The only evidence

plaintiff has is Dr. Dickinson's assertion that an *additional* reason for performing the colonoscopy was Mr. Henry's high risk of recurrent colon polyps due to his history of colon cancer.  First of all, Dr. Dickinson's assertion, *after the fact*, that he believes the primary purpose of the colonoscopy was cancer screening does nothing to refute the records of Dr. Ashley, *the doctor who ordered the procedure*, who stated that the procedure was being performed because of Mr. Henry's complaints of bloody stool. Additionally, this court sees no reason why the policy exclusion at issue here would apply to a colonoscopy performed to diagnose and treat the causes of bloody stool, but not to a colonoscopy performed to screen for colon polyps due to a history of cancer.  Even if, as plaintiff suggests, cancer screening was the primary purpose of the colonoscopy, the procedure still would have been performed to treat a disease or bodily infirmity.[19]

In conclusion, although the court deeply sympathizes with the tragedy and gravity of Mrs. Henry's loss, it must conclude that defendant properly denied her claim for accidental death benefits under the exclusion for injuries incurred as a result of medical treatment of a disease or infirmity.  As defendant did not violate its

---

[19]The result might be different if the procedure had been performed purely for routine screening purposes, such as a routine mammogram or PAP smear.  Here, however, even if the colonoscopy could be considered a "screen" instead of a diagnostic tool, the screen would be necessary because of plaintiff's past history of cancer.

21

contract with Mrs. Henry, her claims for breach of contract and bad faith must fail.[20]

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, it is ORDERED that defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 26th day of May, 2011.

_____
United States District Judge

---

[20]Because the court has concluded that defendant properly denied plaintiff's claim for benefits under the exclusionary language for treatment of disease or infirmity, it need not consider Mr. Henry's death should have been considered an "accident" under the policy.

22